NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0133n.06

No. 09-2214

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MUSKEGON CENTRAL DISPATCH 911,

     **Plaintiff-Appellee,**

v.

TIBURON, INC.,

     **Defendant-Appellant.**

FILED

*Feb 02, 2012*

LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

OPINION

BEFORE:    CLAY, and STRANCH, Circuit Judges; BARRETT, District Judge.[*]

     BARRETT, District Judge.  Plaintiff-Appellee Muskegon Central Dispatch 911 ("MCD")

and Defendant-Appellant Tiburon, Inc. entered into an agreement to implement an integrated public

safety computer system.  A dispute arose under the agreement, and the parties agreed to privately

arbitrate the matter.  The arbitrator found that MCD did not properly terminate the contract and

awarded Tiburon damages and costs.  MCD filed a complaint in state court seeking to vacate the

arbitration award.  Following removal to federal court based on diversity of citizenship, the district

court concluded that the arbitrator exceeded his powers and vacated the award.  For the reasons set

---

     [*]Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

forth below, we **AFFIRM** the district court's decision vacating the award, but remand the dispute to a new arbitrator.

## STATEMENT OF FACTS

### I.  Factual Background

MCD represents a consortium of Muskegon County, Michigan police, fire, and emergency medical service agencies that share an emergency response system.  Tiburon is a supplier of public safety software systems.  On December 30, 2003, MCD and Tiburon entered into a System Implementation Agreement ("SIA") under which Tiburon was to design, implement, and maintain an integrated public safety computer system for MCD.  (R. 28, Ex. A.)  Under the SIA, contract termination is either for cause or without cause:

> **13.1.  Termination for Default.**  Subject to completion of the dispute resolution procedures set forth in Section 12.1 hereof, in the event that either party hereto materially defaults in the performance of any of its obligations hereunder, the other party may, at its option, terminate this Agreement by providing the defaulting party thirty (30) days' prior written notice of termination delivered in accordance with Section 34 hereof, which notice shall identify and describe with specificity the basis for such termination.  If, prior to the expiration of such notice period, the defaulting party cures such default to the satisfaction of the non-defaulting party (as evidenced by written notice delivered by the non-defaulting party in accordance with Section 34 hereof), termination shall not take place.

> **13.2. Termination Without Cause.** [MCD] may terminate this Agreement without cause by providing Tiburon at least thirty (30) days' prior written notice of termination delivered in accordance with Section 33 hereof.

The dispute resolution procedures ("DRP") referenced in Section 13.1 are explained in Section 12.1 of the SIA as follows:

> **12.  Informal Dispute Resolution**

**12.1.** The parties to this Agreement shall exercise their best efforts to negotiate and settle promptly any dispute that may arise with respect to this Agreement in accordance with the provisions set forth in this Section 12.1.

(a) If either party (the "Disputing Party") disputes any provision of this Agreement, or the interpretation thereof, or any conduct by the other party under this Agreement, that party shall bring the matter to the attention of the other party at the earliest possible time in order to resolve such dispute.

(b) If such dispute is not resolved by the employees responsible for the subject matter of the dispute within ten (10) business days, the Disputing Party shall deliver to the first level of representatives below a written statement (a "Dispute Notice") describing the dispute in detail, including any time commitment and any fees or other costs involved.

(c) Receipt by the first level of representatives of a Dispute Notice shall commence a time period within which the respective representatives must exercise their best effort to resolve the dispute. If the respective representatives cannot resolve the dispute within the given time period, the dispute shall be escalated to the next higher level of representatives in the sequence as set forth below.

(d) If the parties are unable to resolve the dispute in accordance with the escalation procedures set forth below, the parties may assert their rights under this Agreement.

| Escalation Timetable (Business Days) | Tiburon Representative | Client Representative |
|---|---|---|
| 0 to 5th | Project Manager | Project Manager |
| 6th to 10th | Operations Manager | COPS Coordinating Committee Chair[1] |
| 11th to 15th | Executive Officer | Chairman of COPS Board |

If a party terminates the SIA "without cause" under Section 13.2, the termination is considered to be for "convenience" under Section 13.3(d). In the event of a termination for convenience by MCD, the SIA provides that Tiburon is entitled to payment for:

---

[1]The Central Operations Police Services ("COPS") Board controls the MCD.

all outstanding invoices submitted to [MCD] prior to the effective date of the termination and for all costs and expenses incurred prior to the effective date of the termination to the extent not invoiced prior to the effective date of the termination, based upon Tiburon's then-current labor rates.

In Section 13.5, the SIA also provides that "[t]he termination of this Agreement shall in no way relieve either party from any obligations hereunder nor limit the rights and remedies of the other party in any manner."

MCD alleges that during the implementation of the system, Tiburon caused numerous delays and failed to respond to concerns raised by David McCastle, MCD's Executive Director. On July 19, 2006, McCastle sent an email to Tiburon's Project Manager, Glenn Matsushima, and his immediate supervisor, Darrell Richards. (R. 29, Ex. 25.) McCastle copied Tiburon's President, Gary Bunyard, and its Board Chairman, Brad Wiggins, on the e-mail, along with the COPS Board of Directors. (*Id*.) In his email, McCastle detailed a number of concerns left unresolved by Tiburon. (*Id*.) In response, Tiburon replaced Matsushima with Robert Towery, who was the fifth project manager over the course of a two and a half year period.

MCD also alleges that there were problems with the actual functioning of the system. In an internal email, Towery acknowledged as much, stating: "In reviewing the contract, we are clearly in material default however, the client has not yet made this connection." (R. 29, Ex. 32.)

On August 25, 2006, in a letter from counsel, MCD notified Tiburon that it was terminating the SIA for cause, effective thirty days thereafter. (R. 29, Ex. 37.) Following the August 25, 2006 letter, there were a number of meetings and communications between the parties. Despite these efforts, MCD reaffirmed its termination of the contract in a letter to Tiburon's counsel dated December 21, 2006. (R. 29, Ex. 40.)

## II.    Procedural Background

### A.    Arbitration Proceedings

On February 28, 2007, Tiburon filed a demand for arbitration with the American Arbitration Association. However, the parties subsequently agreed to privately arbitrate the dispute and entered into an Agreement to Submit to Private Arbitration ("Arbitration Agreement"). (R. 28, Ex. B.)

In the arbitration proceedings, Tiburon filed a statement of claim asserting that MCD terminated the SIA without cause pursuant to Section 13.2 and claiming damages of $456,662.97 pursuant to Section 13.3(d) of the SIA. (R. 1, Ex. B.) MCD denied liability and argued that it had terminated the SIA for cause in the August 25, 2006 letter. MCD counterclaimed for breach of contract in the amount of $516,104.03, plus costs and expenses.[2] (*Id.*, Ex. C ¶¶ 23, 28.) The Arbitrator denied the parties' cross-motions for summary disposition on MCD's claim, finding the existence of genuine issues of material fact regarding MCD's compliance with the dispute resolution procedures in the SIA. (R. 36, Ex. 45, at 6.)

The parties agreed to bifurcate the proceedings in order to present the liability issues first, which would then be followed by evidence on damages. The hearing on liability consisted of twelve days of testimony and presentation of evidence.

In his written opinion at the close of the liability phase, the arbitrator found that "[t]he language of the SIA leaves no doubt that this dispute resolution process [in Section 12.1] was

---

[2]MCD also asserts claims of common law fraud/misrepresentation; unfair and deceptive acts under M.C.L. § 445.901, *et. seq.*; and a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. In a decision not before us, the Arbitrator granted summary disposition for Tiburon on these other claims.

intended as a condition precedent to the termination of the contract for cause." (R. 1, Ex. D, at 3.) The arbitrator found that the language of Section 12.1 was "generally clear and unambiguous," but did not "specifically identify which party has the responsibility to initiate the escalation procedures contained in Section 12.1(d)." (*Id*. at 4.) The arbitrator reasoned that:

> Section 12.1(a) requires that the Disputing Party "shall bring the matter to the attention of the other party." Thus, the Disputing Partly clearly has the obligation to initiate the dispute resolution process. I conclude from a reading of Section 12.1 of the SIA in context that the intent of the parties was to place the responsibility on the Disputing Party not only to initiate the process, but to complete the process and bring it to conclusion. That includes the initiation and conclusion of the escalation procedures in Section 12.1(d).

(*Id*.) The arbitrator identified MCD as the Disputing Party. (*Id*.) The arbitrator found that the July 19, 2006 email sent by McCastle on behalf of MCD constituted a Dispute Notice under Section 12.1. (*Id*. at 7.) After a review of the evidence, the arbitrator concluded MCD had not met the requirements of the "Escalation Timetable" in Section 12.1(d). (*Id*. at 9.) Therefore, the arbitrator concluded that MCD's termination was for convenience under Section 13.2. (*Id*.)

On September 4 and 5, 2008, the arbitrator heard evidence on Tiburon's claim for damages under Section 13.3(d). The arbitrator concluded MCD owed $452,579, "together with interest running at the statutory rate allowed under Michigan law, and taxable costs."

MCD filed a complaint in the Muskegon County Circuit Court to vacate the arbitration award. (R. 1, Ex. A2.) Tiburon then removed the action to the U.S. District Court for the Western District of Michigan. (R. 1.) In cross-motions before the district court, MCD sought to vacate the arbitration award, and Tiburon sought to have the award confirmed. (R. 27, 35.)

**B.      District Court Opinion**

The district court found that in accordance with the Arbitration Agreement, the Michigan

Arbitration Act and Michigan Court Rules, not the Federal Arbitration Act, applied. *Muskegon Cent.*

*Dispatch 911 v. Tiburon, Inc.*, 652 F. Supp. 2d 862, 867 (W.D. Mich. 2009).  The district court

explained that under Michigan law, a court is required to vacate an arbitration award if "'the

arbitrator exceeded his or her powers'" or "'refused to hear evidence material to the controversy.'"

*Id.*  (quoting M.C.R §§ 3.602(c), (d)).  The district court applied the following standard under

Michigan law:

> "Where it clearly appears on the face of the award or the reasons for the decision as
> stated, being substantially a part of the award, that the arbitrators through an error in
> law have been led to a wrong conclusion, and that, but for such error, a substantially
> different award must have been made, the award and decision will be set aside."

*Id.* (quoting *Detroit Auto. Inter-Ins. Exch. v. Gavin*, 331 N.W.2d 418, 430 (Mich. 1982)).  The

district court concluded that MCD met this high standard and vacatur of the arbitration award was

appropriate.

The district court explained that there was "no basis in the language of the contract for the

Arbitrator to allocate responsibility for proceeding through the DRP to a single party."  *Id.* at 868.

The district court pointed out that the plain language of Section 12.1(d) contemplates mutuality of

obligation by referring to the parties in the plural: "'[i]f *the parties* are unable to resolve the dispute

in accordance with the escalation procedures set forth below, *the parties* may assert their rights under

this Agreement.'"  *Id.*  The district court found "[i]n assigning the burden to only one party, the

Arbitrator read his own additional terms into the SIA."  *Id.*  The district court explained that "[b]y

adding words to make the escalation process the obligation of just one party, rather than the mutual

obligation the SIA describes; and by treating the DRP not merely as an exhaustion requirement, but as a winner-take-all bet, the Arbitrator exceeded the scope of his authority." *Id.* at 869.

The district court also found that the arbitrator exceeded the scope of his authority by reading Section 13 as the mandatory and exclusive procedure for a party seeking breach of contract damages. As the district court explained:

> a decision by one party to terminate the contract does not automatically negate all possible bases for contract liability generated before termination. Termination generates one set of potential rights and liabilities for each party, but it does not subsume all other possible claims the contracting parties may have against each other. *See Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 796 (6th Cir. 2003) (parties may invoke independent remedies to the extent not explicitly limited by contract). Termination liability or its absence is just one aspect of the overall contractual rights and liabilities of the parties.

*Id.* at 869–70. Accordingly, the district court issued an order vacating "the arbitral decisions on liability, damages and costs" and remanding "to address issues submitted to the Arbitrator but not resolved." *Id.* at 870. The district court concluded that a remand to the same arbitrator was appropriate. *Id.*

## DISCUSSION

**I.      Legal Standards**

**A.      Choice of Law**

This case falls within the scope of the Federal Arbitration Act ("FAA") because the Arbitration Agreement, read together with the SIA, is a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Although the FAA "governs all aspects of arbitration procedure and preempts inconsistent state law[,]" *Stout v. J.D. Byrider*, 228 F.3d 709, 716 (6th Cir. 2000), where "the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the

terms of the agreement is fully consistent with the goals of the FAA." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989); *see also Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 288–89 (3d Cir. 2010).

In making a choice of law determination, the central inquiry is whether the parties' agreement evinces an unambiguous intent to "predicate[] the court's judicial action on the parties' having agreed to specific standards." *Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 n.6 (2008); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 66 (1995) (stating that parties' intent controls); *Pub. Serv. Credit Union v. Ernest*, 988 F.2d 627, 629 (6th Cir. 1993) (finding that district court erroneously relied on FAA, where "both parties agreed that the Michigan statute controlled their agreement" to arbitrate). Ambiguities are resolved in favor of the federal standard. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 n.9 (2002).

In this case, the Arbitration Agreement evidences the unambiguous intent of the parties to apply Michigan law in any subsequent appeal of the arbitration award. Paragraph 1 of the Arbitration Agreement explicitly refers to the Michigan Arbitration Act in stating that disputes "shall be submitted to final and binding arbitration in accordance with the provisions of this Submission Agreement and pursuant to the provisions of MCL 600.5001-600.5035." (R. 28, Ex. B ¶ 1.) The Arbitration Agreement makes numerous other references to Michigan law, (*id.* ¶¶ 3 (applicable law generally); 6 (disqualification); 9(h) (discovery)), and most notably, Paragraph 18 states that:

> ¶ 18. Award. . . . Judgment upon the [arbitration] decision may be entered in any court that has jurisdiction over the parties, in accordance with the Michigan Arbitration Act, being MCL 600.5001, et. seq. Appeals from the arbitration award shall be conducted as provided for in MCL 600.5001, [et] seq. and MCR 3.602[.]

(*Id.*)

Moreover, the Arbitration Agreement neither refers to the Federal Arbitration Act, nor otherwise suggests that either party sought to "invoke[] the FAA in the arbitration agreement." *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 303 (6th Cir. 2008) (concluding that federal law governed, where the parties' choice of law provision referenced both the state and federal arbitration acts). To the contrary, Paragraphs 1 and 18 expressly incorporate the Michigan Arbitration Act into the agreement, and Paragraph 18 provides that state law will govern entry of judgment by a court and all appeals. *See, e.g.*, *Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 710 (6th Cir. 2005) (concluding that a generic choice-of-law provision does not displace the federal standard for vacating an arbitration award), *abrogated on other grounds by Hall Street Assoc.*, 552 U.S. 576 (2008).

Accordingly, because the Arbitration Agreement unambiguously provides that the Michigan Arbitration Act will govern subsequent proceedings, we find that the parties intended to displace the federal standard and that Michigan law provides the legal standard.

**B.     Standard of Review**

When reviewing a district court's decision to vacate an arbitration award, we review factual findings for clear error and questions of law *de novo*. *Green v. Ameritech Corp.*, 200 F.3d 967, 974 (6th Cir. 2000).

Under Michigan law, a court's power to modify, correct, or vacate an arbitration award is limited by the Michigan Court Rules. *Gordon Sel-Way, Inc. v. Spence Bros., Inc.*, 475 N.W.2d 704, 709 (Mich. 1991). A court shall vacate an arbitration award if "(a) the award was procured by corruption, fraud, or other undue means; (b) there was evident partiality by an arbitrator appointed

as a neutral, corruption of an arbitrator, or misconduct prejudicing a party's rights; (c) the arbitrator exceeded his or her powers; or (d) the arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights." Mich. Ct. Rule § 3.602(J)(2). Michigan courts have explained that "arbitrators can fairly be said to exceed their power whenever they act beyond the material terms of the contract from which they primarily draw their authority, or in contravention of controlling principles of law." *Gavin*, 331 N.W.2d at 430; *see also Gordon Sel-Way*, 475 N.W.2d at 709. Thus, "'where it clearly appears on the face of the award or the reasons for the decision as stated, being substantially a part of the award, that the arbitrators through an error in law have been led to a wrong conclusion, and that, but for such error, a substantially different award must have been made, the award and decision will be set aside.'" *Gavin*, 331 N.W.2d at 434 (alteration omitted) (quoting *Howe v. Patrons' Mut. Fire Ins. Co. of Michigan*, 185 N.W. 864, 867–68 (Mich. 1921)).

Michigan courts have explained that "[j]udicial review of an arbitrator's decision is narrowly circumscribed." *City of Ann Arbor v. Am. Fed'n of State, Cnty., & Mun. Emps. Local 369*, 771 N.W.2d 843, 854 (Mich. Ct. App. 2009) (citing *Police Officers Ass'n of Mich. v. Manistee Cnty.*, 645 N.W.2d 713 (Mich. Ct. App. 2002)). Specifically, "[a] court may not review an arbitrator's factual findings or decision on the merits." 771 N.W.2d at 854. A reviewing court is also prohibited from engaging in contract interpretation, which is an issue for the arbitrator to determine. *Id.* (citing *Konal v. Forlini*, 596 N.W.2d 630 (Mich. Ct. App. 1999)).

## II.    Analysis

Tiburon appeals the district court's two holdings in support of vacatur, namely that the

Arbitrator exceeded his powers (1) by concluding MCD had the responsibility to escalate and

complete the DRP; and (2) by reading Section 13 as the exclusive remedy for breach of contract.

In support, Tiburon argues that a court may not interfere with the arbitrator's judgment on procedural

issues.  Tiburon maintains that the arbitrator decided, and the parties agreed, that the sequencing of

his decision on the issues presented was such that the arbitrator would only reach Tiburon's alleged

breach of contract if the DRP completion issue was decided in MCD's favor.  Although procedural

issues are generally reserved for the arbitrator, *Bennett v. Shearson Lehman-Am. Exp., Inc.*, 423

N.W.2d 911, 913 (Mich. Ct. App. 1987), MCD's assignments of error are not properly characterized

as procedural matters beyond the scope of our review.  For this reason, and as fully explained below,

we will affirm.

### A.    Burden to Escalate under Section 12

Tiburon argues that the district court erred in ruling that the arbitrator had exceeded his

powers by concluding that under Section 12 of the SIA, MCD had the responsibility to escalate and

complete the DRP.  Tiburon points out that the SIA was silent as to which party has the burden to

escalate and complete the DRP.

In addressing this argument, the district court applied reasoning found in the Michigan

Supreme Court's decision in *Detroit Automobile Inter-Insurance Exchange v. Gavin*:

> As *Gavin* points out, in agreeing to arbitration, the parties' central focus is the benefit
> of the bargain they entered-the substantive terms of the agreement-not process.
> Where parties to a contract provide specifically for the use of arbitration to resolve
> significant disputes, "it is clear that the primary concern of the parties is the

enforcement of the terms of the agreement which they have made, securing to each of them the benefits to which they are entitled under the applicable law, including their own agreement." Of secondary concern are the procedural mechanisms by which disputes will be resolved. "The process of dispute resolution and the procedural advantages of arbitration are the servants of the law governing the issues in dispute, not the reverse."

*Muskegon Cent. Dispatch 911*, 652 F. Supp. 2d at 867–68 (citations omitted). The district court found that the reasoning in *Gavin* applies "not only to the ultimate arbitration process, but also to the preliminary dispute resolution steps leading to the eventual arbitration." *Id.* at 868. The district court found that under *Gavin*, "the DRP of Section 12 imposes mutual obligations that are the servant, not the master of the substantive contract obligations." *Id.* (emphasis omitted).

The district court explained that incorporating mutual obligations to carry out the escalation process makes practical sense:

> The purpose of an escalation process such as the DRP is to resolve as many disputes as possible on business terms, leaving only the most intractable and substantive problems for arbitration. Business solutions by their nature require both parties to engage and compromise. When one or both parties loses interest in or the ability to reach a business solution, the practical value of the DRP is exhausted-it is no longer a servant of the parties' mutual obligation to work for informal resolution.

*Id.* at 868. The district court noted that it was Tiburon that initiated the arbitration, and thus "[i]t would be especially odd to penalize MCD for failing to exhaust informal means when Tiburon actually initiated the arbitration process." *Id.* at 868–69.

Tiburon argues that by engaging in this analysis, the district court was engaging in contract interpretation, which is a duty reserved for the arbitrator. Tiburon would be correct if the SIA was indeed silent as to which party has the responsibility to complete the escalation procedures. However, as the district court explained, the plain language of the contract expressly refers to both

parties: "[i]f *the parties* are unable to resolve the dispute in accordance with the escalation procedures set forth below, *the parties* may assert their rights under this Agreement." *Id.* at 868. Any fair reading of the contract language makes it clear that the parties intended a mutual obligation to carry out the escalation process. *See Morley v. Auto. Club of Mich.*, 581 N.W.2d 237, 240–41 (Mich. 1998) (quoting *Maclean v. Fitzsimons*, 45 N.W. 145, 146 (Mich. 1890) (explaining rule that "what is plainly implied from the language used in a written instrument is as much a part thereof as if it was expressed therein")). By ignoring this language, the arbitrator exceeded his power. *See Gavin*, 331 N.W.2d at 430. Therefore, it was not error for the district court to vacate the award of the arbitrator.

**B.      Section 13 as Exclusive Remedy for Breach of Contract**

The district court found that the arbitrator exceeded the scope of his authority by applying Section 13 as the exclusive procedure for a party seeking breach of contract damages. *Muskegon Cent. Dispatch 911*, 652 F. Supp. 2d at 869. As a result, the arbitrator never reached the merits of MCD's breach of contract claim. *See id.* at 868. Tiburon argues that MCD did not argue before the arbitrator that its breach of contact claim should be decided independent of the issue of completion of the DRP. Tiburon argues that this constituted a waiver of the issue. However, in the brief MCD submitted during the damages phase of the arbitration proceedings, MCD stated:

> Given the lack of any discussion in the Opinion regarding any breach of the SIA by either party, MCD can only assume that the Arbitrator concluded that MCD waived its right to sue for breach of contract by falling short of successfully invoking the SIA's termination for cause provision. MCD disagrees with this implied conclusion and further disagrees that terminated the SIA "without cause," but is nevertheless proceeding to the hearing based on the belief that the Arbitrator's ruling has foreclosed MCD's opportunity to prove its damages.

(R. 43, Ex. 1.)

After reviewing the record, the district court found that the Arbitrator was presented with the issue of MCD's breach of contract claim, but never reached the issue:

> In neither his opinion on liability nor his opinion on damages did the Arbitrator address the merits of MCD's breach of contract claim. Indeed, the arbitrator never made any findings on whether Tiburon breached its own contractual obligations, as MCD claimed, and as Tiburon's own project manager believed. Instead, the Arbitrator treated what he found as MCD's failure to comply with the DRP, coupled with the termination provisions, as essentially a forfeiture of MCD's right to assert breach. The Arbitrator's decision resulted in MCD losing entirely and Tiburon winning entirely, without any finding on whether Tiburon was in material breach of substantive obligations.

*Muskegon Cent. Dispatch 911*, 652 F. Supp. 2d at 866–67.

The district court correctly concluded that the Arbitrator's decision resulted in a forfeiture of MCD's breach of contract claim. This result is contrary to Michigan law, which provides that "where one party to a contract commits a material breach, the nonbreaching party is entitled to terminate the contract." *Convergent Grp. Corp. v. Cnty. of Kent*, 266 F. Supp. 2d 647, 657–58 (W.D. Mich. 2003) (citing *Lynder v. S.S. Kresge Co.*, 45 N.W.2d 319, 325 (Mich. 1951)). Parties are free to modify this rule by conditioning the right to terminate upon some condition precedent. *Id.* at 658. However, as the district court noted, the parties in this instance did not do so. There was no language in the SIA stating that Section 13 is the exclusive remedy for a party seeking breach of contract damages. *Cf. Short v. Hollingsworth*, 289 N.W. 158, 159 (Mich. 1939) (holding that "[i]f it appears to have been the intention that the remedy specified in the contract should be exclusive, the rights of the parties will be controlled thereby"). Therefore, the district court did not err by

vacating the award of the arbitrator and remanding the case to the arbitrator for decision on the merits of MCD's breach of contract claim.

## C.    Arbitrator on Remand

The district court held that the Arbitrator originally selected by the parties is the appropriate person to handle any further proceedings.  We disagree.

The Michigan Court Rules permit a court to vacate an arbitration order and remand for rehearing.  Mich. Comp. Laws § 3.602(J).  However, the *functus officio* doctrine provides the circumstances in which remand to the original arbitrator, rather than a new arbitrator, is appropriate. *Green*, 200 F.3d at 976–77.

The Latin term "functus officio" means that "having performed his or her office," an official is "without further authority or legal competence because the duties and functions of the original commission have been fully accomplished."  Black's Law Dictionary 743 (9th ed. 2009).  "The policy behind the doctrine is an unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which has already been rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion." *Oakwood Labs. v. Howrey Simon Arnold & White, LLP*, 2007 WL 1544577, at *2 (N.D. Ohio May 24, 2007) (internal citations omitted).

In general, "'once an arbitrator has made and published a final award his authority is exhausted and he is *functus officio* and can do nothing more in regard to the subject matter of the arbitration.'" *McClatchy Newspapers v. Cent. Valley Typographical Union*, 686 F.2d 731, 734 (9th Cir. 1982) (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967)); *see*

*also Beattie v. Autostyle Plastics, Inc.*, 552 N.W.2d 181, 184 (Mich. Ct. App. 1996) (recognizing the doctrine of *functus officio*). This means that where a vacated arbitration award is remanded and requires a reopening of the merits of a claim, remand to a new arbitrator is appropriate. *Cf. Green*, 200 F.3d at 977–78 (noting that if remand was warranted, remand would be to original arbitrator because he would simply be completing his duties by clarifying his reasoning, not reopening the merits of the case); *M & C Corp. v. Erwin Behr GmbH & Co.*, 326 F.3d 772, 783 (6th Cir. 2003) (remanding to original arbitrator is proper where arbitrator is not reopening the merits of a case).

However, there are exceptions to the *functus officio* doctrine that direct when remand to the original arbitrator is appropriate: "(1) an 'arbitrator can correct a mistake which is apparent on the face of his award'; (2) 'where the award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not exhausted his function and it remains open to him for subsequent determination'; and (3) '[w]here the award, although seemingly complete, leaves doubt whether the submission has been fully executed, an ambiguity arises which the arbitrator is entitled to clarify.'" *Green*, 200 F.3d at 977 (quoting *La Vale Plaza*, 378 F.2d at 573).

In the instant case, there are two reasons supporting our decision to vacate the award and remand: (1) the Arbitrator exceeded his powers when he reviewed Tiburon's contract claim and decided that MCD had the burden to escalate, and (2) the Arbitrator was presented with MCD's contract claim but failed to review the merits of it.

We decide that Tiburon's contract claim should be remanded to a new arbitrator. Where an arbitration award is vacated because the arbitrator exceeded his or her powers, the Michigan Court Rules grant the court discretion to remand to a new arbitrator or the original arbitrator. Mich. Comp.

Laws § 3.602(J)(4). Because the original arbitrator here would also be required to reopen the merits of Tiburon's contract claim, remand to the original arbitrator "implicate[s] . . . the concerns underlying the *functus officio* doctrine." *Green*, 200 F.3d at 978. Thus, a new arbitrator should review Tiburon's contract claims.

We decide that MCD's contract claim should also be reviewed by the new arbitrator. The original arbitrator, although presented with the MCD's contract claim, did not review the merits of it. Under the second exception to *functus officio*, we would normally remand the unreviewed claim to the original arbitrator to give him the opportunity to review it for the first time and complete his duty with respect to that claim. However, submitting Tiburon's contract claim to a new arbitrator and MCD's contract claim to the original arbitrator would be inefficient. In the interest of fairness and efficiency, we remand all claims to a new arbitrator.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court, but remand the dispute to a new arbitrator.