**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0059n.06
Filed: January 16, 2008

No. 06-2637

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FLAGSTAR BANK, F.S.B.,                                )
                                                      )
   **Plaintiff-Appellant,**                    )          **ON APPEAL** FROM THE
                                                      )          UNITED STATES DISTRICT
v.                                                    )          COURT FOR THE EASTERN
                                                      )          DISTRICT OF MICHIGAN
FEDERAL INSURANCE CO. &                               )
CONTINENTAL CASUALTY CO.,                             )
                                                      )          **O P I N I O N**
   **Defendants-Appellees.**                   )
_____              )

**Before: BATCHELDER and MOORE, Circuit Judges, and BUNNING,[*] District Judge.**

**KAREN NELSON MOORE, Circuit Judge.** Flagstar Bank, F.S.B. ("Flagstar") appeals from the district court's grant of summary judgment to its primary insurer, Federal Insurance Co. ("Federal"), as well as to its secondary insurer, Continental Casualty Co. ("Continental"). Because we agree that Flagstar cannot recover under the provision of its insurance agreement covering loss that directly results from forgery, when Flagstar's loss arose because of the fictitious character of collateral offered to secure a loan, we **AFFIRM** the decision of the district court.

---

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. FACTS AND PROCEDURE

### A. Background

Flagstar is a wholly-owned subsidiary of Flagstar Bancorp, Inc., which is incorporated under the laws of the state of Michigan, its principal place of business. Neither Federal nor Continental are citizens of Michigan, and this case satisfies the diversity jurisdiction requirements. *See* 28 U.S.C. § 1332(a). The district court opinion, *Flagstar Bank, F.S.B. v. Federal Insurance Co.*, No. 05-70950, 2006 WL 3343765, slip op., at **1-4 (E.D. Mich. Nov. 17, 2006), provides a detailed discussion of the facts in this case, and we relate here only those most pertinent. Flagstar conducts what is known as dry-warehouse-lending transactions, in which it advances funds to a mortgage bank only after receiving collateral. Flagstar generally will not advance any money until it has received four documents from a mortgage banker: (1) a request for an advance; (2) an executed note and mortgage; (3) evidence of assignment of the note; and (4) confirmation of a third-party investor's commitment to purchase the mortgage. Flagstar does not underwrite the loan or evaluate the mortgagor's ability to repay.

In 2003, Flagstar entered into a warehouse-lending agreement with a Colorado mortgage broker named Amerifunding and ultimately extended to Amerifunding a twenty-million-dollar line of credit. Consistent with its policies, Flagstar required Amerifunding to submit several documents to obtain advances, including original promissory notes executed by individual borrowers. Instead of advancing the funds directly to Amerifunding, Flagstar advanced the monies to Security National Title Company, which held the funds in escrow through the closing date. TDF Mortgage Funding had purportedly agreed to purchase the mortgages; however, Amerifunding had created this fictional permanent investor. Indeed, Amerifunding had perpetrated a massive fraud scheme against Flagstar.

2

In February and March, 2004, Amerifunding submitted thirty-nine promissory notes that represented what were later discovered to be non-existent mortgage transactions. Amerifunding used the stolen identities of natural persons to issue the notes and forged the signatures of these thirty-nine individuals on the false notes. Flagstar discovered the full value of its loss on March 12, 2004, when it determined that Amerifunding owed it $19,174,553.

Flagstar seeks recovery from Federal and Continental under insurance agreements with these companies, for the loss arising from Flagstar's loans to Amerifunding. Federal issued to Flagstar a $10 million Financial Institution Bond for 2004 ("the Federal Bond"), and Continental issued Flagstar a $15 million excess bond for the same year ("the Continental Bond"), made subject to the terms and conditions of the Federal Bond. Clause 4 of the Federal Bond promises coverage for: "[l]oss resulting directly from . . . **Forgery** on, or fraudulent material alteration of, any **Negotiable Instrument** (other than an **Evidence of Debt**) . . . ." Joint Appendix ("J.A.") at 44 (Fed. Bond at 3). The Federal Bond defines "Forgery" as "the signing of the name of another natural person with the intent to deceive." J.A. at 53 (Fed. Bond at 12).

On February 25, 2005, Federal issued Flagstar a letter denying coverage under Clause 4 of the Federal Bond. The letter stated that "Flagstar . . . would have sustained the same loss, even if the notes had been legitimately signed." J.A. at 583 (2/25/05 Letter at 4). On February 28, 2005, Continental authored a letter adopting Federal's analysis of Clause 4 and denying coverage under the Continental Bond.

3

**B. Procedural Background**

On August 9, 2006, the district court granted summary judgment to Continental on the ground that even if coverage were appropriate under Clause 4, Flagstar's loss did not exceed the single-loss liability limit of the Federal Bond. On November 17, 2006, the district court granted Federal's motion for summary judgment on the basis that Flagstar's loss resulted from the fictitious nature of the collateral and did not directly result from forgery. The district court explained: "Flagstar's evidence fails to raise a genuine issue of material fact regarding the value of its collateral in light of Federal's showing that the underlying mortgage transactions never took place and the mortgage notes did not represent real transactions or promises." *Flagstar Bank*, 2006 WL 3343765, at *8. Flagstar filed a timely notice of appeal.

## II. ANALYSIS

**A. Standard of Review**

We review the district court's order granting summary judgment de novo. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007); Fed. R. Civ. P. 56(c). We determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Bryson v. Regis Corp.*, 498 F.3d 561, 569 (6th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

**B. Clause 4 of the Federal Bond**

We assume that the promissory notes provided by Amerifunding to Flagstar as collateral are negotiable instruments and not evidence of debt, as defined by the Federal Bond, and that the notes are thus qualifying documents under Clause 4 of the Federal Bond. The analysis in this case turns on whether the notes would have held value were they not forged and, if inherently valueless, whether their worthlessness compels the conclusion that Flagstar's loss did not directly result from forgery.

The district court concluded that because the notes and other mortgage documents "did not represent real transactions, Flagstar did not hold anything of value to secure its advances. The notes were not backed up by an actual interest in real estate and were themselves not real promises to pay money as a result of a loan." *Flagstar Bank*, 2006 WL 3343765, at *8. We agree.

We are not persuaded by Flagstar's argument that our decision in *Union Planters Bank, N.A. v. Continental Casualty Co.*, 478 F.3d 759 (6th Cir. 2007), requires reversal of the district court judgment. That case involved a fraud scheme perpetrated by a mortgage bank against Union Planters Bank, acting as a warehouse lender. The mortgage bank had made some legitimate mortgages but then forged those applicants' signatures and used their personal information to generate fraudulent mortgages. *Id.* at 761-62. We held that Union Planters Bank's "losses directly resulted from loans extended on the basis of a pool of forged collateral." *Id.* at 764.

Flagstar argues that the facts in *Union Planters* are "indistinguishable" from the current case. Plaintiff-Appellant Br. at 30. But the *Union Planters* panel distinguished the district court's decision in *Flagstar*: "the collateral the bank received in [*Flagstar*] was entirely fictitious: the named borrowers were never customers of the mortgage lender; no permanent lender ever purchased any

of the mortgage loans; and even if the loans had borne legitimate signatures, they still would have been worthless." *Union Planters*, 478 F.3d at 765. We are not bound by this distinction, as we are currently reviewing the district court opinion that was the subject of the comparison; nevertheless, we believe that Flagstar's situation is distinguishable from *Union Planters*. Flagstar protests that, like the fraudulent duplicated mortgages at issue in *Union Planters*, the promissory notes at issue in this case would have held value had they not been forged. Flagstar rests this argument on the contention that a promissory note represents an unconditional promise to pay and does not depend on the existence of other assets. But this assertion ignores the fictitious character of the transaction that purportedly gave rise to the notes. In light of our determination that the notes would not have held value even if they had authentic signatures, we agree with the *Union Planters* panel that the holding in that case does not conflict with a finding that Flagstar's loss did not directly result from forgery.

The district court correctly followed the logic of cases holding that the clauses of financial institution bonds, which cover loss resulting either directly or indirectly from forgery, do not cover loss arising from the extension of loans based on fictitious collateral. *See, e.g.*, *Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank*, 912 F.2d 756, 757 (5th Cir. 1990) (holding that "bogus stock certificates" cannot be considered "counterfeit" for the purposes of insurance coverage "because there never existed any one or more particular genuine AIG stock certificates which the bogus certificates could be said to purport to be or represent or imitate"); *KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyd's*, 965 F. Supp. 1047, 1054 (W.D. Tenn. 1997) (holding that a bank's loss did not result directly from forgery when the bank made loans to an individual on the basis of a fraudulent letter stating falsely that the individual would receive a bonus from his

6

employer); *French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 752 F. Supp. 83, 91 (S.D.N.Y. 1990) (holding that a bank's loss resulted from fraud rather than forgery when it made loans to a company on the basis of bills of lading representing "non-existent or previously completed transactions"); *Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F. Supp. 860, 863 (D.N.J. 1983) (holding that a blanket bond insures a bank against losses arising from loan documents that are counterfeited or forged, but does not assume the risk for the truth of the documents); *Georgia Bank & Trust v. Cincinnati Ins. Co.*, 538 S.E.2d 764, 766 (Ga. Ct. App. 2000) (holding that a blanket bond did not protect a bank that made a loan to individuals based on falsified documents attesting to a purported positive balance in a credit-union savings account).

Flagstar argues that these cases can be distinguished because the documents at issue in the other cases—stock certificates, a letter attesting to a forthcoming bonus, a bill of lading, a savings-account statement, and certificates of deposit—differ from promissory notes. According to Flagstar, those documents attested to external assets that were subsequently proven not to exist, while the promissory note itself holds value because of the promise to pay. Once again, the merit in Flagstar's argument depends on whether Flagstar might have enforced the promissory notes but for the forgery. As explained *supra*, this conclusion is insupportable.

The cases cited by Flagstar, in which courts accepted banks' arguments that their losses resulted from forgery, can be distinguished. First, in *Jefferson Bank v. Progressive Casualty Insurance Co.*, 965 F.2d 1274, 1283 n.16 (3d Cir. 1992), the Third Circuit found that but for the forgery the bank would have held valuable securities. *Jefferson Bank* thus did not disagree with but rather rejected the line of cases holding that banks' losses did not result from forgery when the banks held fictitious collateral. *Id.* The Third Circuit proceeded to find that a genuine issue of material

fact existed as to whether the forged signature was a proximate cause of the bank's loss. *Id.* at 1284-85. Second, the decision in *Richardson National Bank v. Reliance Insurance Co.*, 491 F. Supp. 121 (N.D. Tex. 1977), does not support Flagstar's position because that case involved an insurance clause containing a different causation standard than the one at issue here. The insurance clause contested in *Richardson* provided coverage for loss arising "through" reliance on a forgery rather than coverage for loss "resulting directly" from forgery. *See id.* at 122. Third, Flagstar cites *M.G. Bancorp., Inc. v. Reliance Insurance Co.*, No. 87 C 10470, 1989 WL 20774 (N.D. Ill. Mar. 3, 1989) (unpublished opinion), an unpublished decision interpreting Illinois law to hold that an insurance clause covering loss "resulting directly" from forgery, covers loss resulting from reliance on forged documents. *Id.* at **3-4. The Illinois Court of Appeals, however, rejected the logic of *M.G. Bancorp* in *RBC Mortgage Co. v. National Union Fire Insurance Co.*, 812 N.E.2d 728 (Ill. Ct. App. 2004). *RBC Mortgage* held that the language "resulting directly" establishes a causation standard more stringent than the "proximate cause" standard. *Id.* at 733, 735-37. Finally, we agree with the district court that the letter-of-credit transaction at issue in *Omnisource Corp. v. CNA/Transcontinental Insurance Co.*, 949 F. Supp. 681 (N.D. Ind. 1996), differs from mortgage-warehousing transactions in significant respects and that the case is therefore inapposite.

Since the district court decision in *Flagstar*, the Seventh Circuit decided the case of *First National Bank of Manitowoc v. Cincinnati Insurance Co.*, 485 F.3d 971 (7th Cir. 2007). First National Bank had extended a line of credit to a used-car dealership upon receipt of car leases purportedly signed by customers. The president of the dealership had committed fraud both by submitting fictitious leases and altering the terms of real leases, forging customers' signatures in each case. The dealership defaulted on its loans after the president disappeared. The bank sought

recovery under two distinct clauses of its insurance policy. Insuring Agreement E covered "[l]oss

*by reason of* the Insured . . . having in good faith and in the usual course of business . . . acted upon

any security, document, or other written instrument which proves to have been a forgery." *Id.* at 975

(emphasis added). Insuring Agreement D had a heightened causation standard, employing the

"resulting directly" language at issue in the current case. *Id* at 979. The Seventh Circuit reasoned:

"Insuring Agreements D and E thus cover similar and potentially overlapping categories of loss

. . . ." *Id.* The court decided the case in favor of the bank, however, under the less stringent

causation standard created by Insurance Agreement E. *Id.* at 980. Thus, *Manitowoc* does not

provide support for Flagstar's position because the Seventh Circuit upheld coverage under a different

causation standard than the one contained in Clause 4 of the Federal Bond.[1]

---

[1]Flagstar points to dicta in *Manitowoc* rejecting *Georgia Bank & Trust*'s reasoning that an insurance clause covering forgery does not cover loss arising from forged documents representing fictitious assets. *Id.* at 980. The Seventh Circuit highlighted the fact that the opinion in *Georgia Bank & Trust* "cited both Insuring Agreements D and E . . . without specifically addressing the language of either." *Id.* With respect to the Georgia Court of Appeals's conclusion that the bank would have suffered the same loss regardless of the forgery, the Seventh Circuit stated: "This conclusion ignores the practical reality of the situation; but for the forged documents purporting to verify the existence of the collateral, credit would not have been extended in the first place, and there would have been no loss." *Id.* On its face, the Seventh Circuit's dicta supports Flagstar's argument. But this dicta should be understood in the context of the Seventh Circuit's conclusion that a causal connection existed between the forgery and the bank's loss, under the causation standard set forth in Insurance Agreement E. Had Clause 4 of the Federal Bond also required only that Flagstar suffered a loss "by reason of" forgery, then we might reach the conclusion that Flagstar could recover for its loss under the clause because it had relied on the forged notes. Clause 4 of the Federal Bond, however, does not create this proximate-cause standard and instead requires that Flagstar's loss "result directly" from forgery. Therefore, we conclude that the dicta in *Manitowoc* concerning the opinion in *Georgia Bank & Trust* does not buttress Flagstar's argument.

### III.  CONCLUSION

Because Flagstar's loss did not directly result from forgery, we **AFFIRM** the judgment of the district court granting summary judgment to Federal and to Continental.